IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| RENE ESQUIVEL GALLEGOS, | § § | |
| Petitioner, | § § | |
| v. | § § | 1:20-CV-92-RP |
| YULISA ITZEL GARCIA SOTO, | § § | |
| Respondent. | § § | |

**ORDER**

Before the Court in this Hague Convention case is Petitioner Rene Esquivel Gallegos's ("Esquivel") Complaint, (Dkt. 5), in which Esquivel seeks the return of his five-year-old child, Y.E.G., to Mexico. On March 6, 2020, the Court held a consolidated injunction and merits hearing at which Esquivel and Respondent Yulisa Itzel Garcia Soto ("Garcia") appeared and presented arguments concerning the propriety of Y.E.G.'s return. (*See* Minute Entry, Dkt. 23). *See also* Fed. R. Civ. P. 65(a); *John v. State of La. (Bd. of Trustees for State Colleges & Universities)*, 757 F.2d 698, 704 (5th Cir. 1985)). The Court also ordered the parties to file supplemental briefing on the merits of Garcia's "grave risk" defense and what standard should be used to evaluate it. (Order, Dkt. 26; Resp.'s Br., Dkt. 30; Pet.'s Br., Dkt. 33). After considering those arguments, the record, and the relevant law, the Court grants Esquivel the relief he seeks and orders Y.E.G.'s return to Mexico. However, in light of the COVID-19 pandemic, the Court stays the order pending a finding that Y.E.G could be safely returned, to be determined during or after a status conference with the parties. (*See generally* Am. Emergency Order, Dkt. 34).

**I. BACKGROUND**

Esquivel alleges that Y.E.G. "was, without [Esquivel's] consent or acquiescence, wrongfully removed from Mexico and brought to the Western District of Texas by Respondent, Yulisa Itzel

1

Garcia Soto [("Garcia")], Y.E.G.'s mother." (Compl., Dkt. 5, at 1). Esquivel is Y.E.G.'s biological father and asserts that he "has exercised custody rights over Y.E.G. since [the child] was born." (*Id.* at 4). Esquivel and Garcia, who "were in a free union," lived with Y.E.G. in Tuzantla, Michoacán, Mexico, before and after Y.E.G. was born. (*Id.* at 6). In the early hours of December 14, 2018, "with no warning, Garcia took Y.E.G. and left their habitual residence while Esquivel was sleeping." (*Id.*). Esquivel, unaware of Garcia and Y.E.G.'s whereabouts, was able to contact Garcia only sporadically to ask her to return, but she refused. (*Id.* at 6–7). Around February 20, 2019, Esquivel learned that Garcia had entered the United States; his repeated requests for her to return with Y.E.G. were rebuffed. (*Id.* at 7). Garcia, Y.E.G., and some additional members of Garcia's family currently live in Pflugerville, Texas. (*Id.*; Pet.'s Br., Dkt. 33, at 3).

On June 4, 2019, "as soon as he could," Esquivel filed a petition for Y.E.G.'s return with the Mexican government. (Compl., Dkt. 5, at 8; Pet.'s Ex. B, Dkt. 5-2). Sometime between then and January 27, 2020, the United States Department of State received the case and referred it to Esquivel's current counsel. (See Mot. TRO, Dkt. 3, at 8). On January 27, 2020, Esquivel filed a motion to proceed in forma pauperis ("IFP"), (Dkt. 1), a motion for a temporary restraining order ("TRO"), (Dkt. 3), and a motion to seal the other motions' associated exhibits, (Dkt. 2). The Court granted the IFP and TRO motions on January 28, 2020. (Order, Dkt. 4). The TRO order prohibited Y.E.G.'s removal from the Austin Division and required Garcia to surrender Y.E.G.'s passport, (Order, Dkt. 4, at 8), though Garcia later clarified that Y.E.G. does not possess a passport.

Esquivel was then able to file his complaint the same day. (Compl., Dkt. 5). The Court set a hearing and a briefing schedule. (Order, Dkt. 4, at 8). Garcia, who was not yet represented by counsel, did not respond in writing to Esquivel's complaint. On February 5, 2020, Esquivel filed a motion for expedited discovery, asking to depose Garcia prior to the hearing and requesting document production. (Dkt. 10). The Court granted it the following day and set a deadline for

2

Garcia to respond, (Order, Dkt. 11), which she did not. On February 13, 2020, Esquivel filed a motion asking that the Court permit him and witnesses in Mexico to appear by phone or videoconference. (Dkt. 13). The Court granted it the following day. (February 14, 2020, Text Order). Throughout these proceedings, Esquivel timely served Garcia with all required documents. (*See* Dkt. 9, 13).

On February 21, 2020, the Court held a hearing meant to be the consolidated injunction/merits hearing. (*See* Minute Entry, Dkt. 16). Garcia appeared in court without counsel. The Court explained the nature of the proceedings and rescheduled the hearing to allow her time to find counsel. Mexican consulate staff were also present. At the hearing, Esquivel requested daily phone conversations with Y.E.G. Garcia did not oppose the request and maintained not only that she had never stopped Esquivel from speaking with Y.E.G., but that she had recordings of them speaking.

On March 3, 2020, the Court held the reset hearing. (*See* Minute Entry, Dkt. 20). Garcia appeared, accompanied by counsel, who said that he was not ready to proceed. He also said that Garcia removed Y.E.G. because of "threats, duress, and fear of the father." Esquivel's counsel told the Court that he deposed Garcia on March 2, 2020. The Court granted Garcia's counsel's motion to appear pro hac vice and reset the hearing. (Order, Dkt. 22).

At the March 6, 2020, hearing, Garcia appeared in person; Esquivel and his childhood friend and Y.E.G's godfather appeared by telephone. (Minute Entry, Dkt. 23). Difficulties with the connection rendered testimony halting. All three witnesses appeared through interpreters.

Garcia contested Esquivel's version of events through testimony and argument. Through counsel, she questioned Esquivel and testified herself about her allegations that he sexually assaulted her repeatedly over the course of a year, that he and his family members controlled her movements and ability to leave the house and/or neighborhood, that Esquivel attempted to dissuade Y.E.G.

3

from listening to her, that Esquivel kept Y.E.G. from making friends with other children, that Esquivel gave Y.E.G. beer to drink, that he threatened to "drag her back" after she left Tuzantla, and that his mother directly threatened her safety and her custody of Y.E.G. as he stood by. Esquivel denied each allegation.

At the hearing, the parties also clarified the precise order of events leading up to the commencement of these proceedings. Garcia and Y.E.G. entered the United States on or about February 22, 2019, according to Garcia's testimony and documentation she provided. Esquivel filed his first motion in this case on January 27, 2020. (Dkt. 1).

## II. LEGAL STANDARD AND APPLICABLE LAW

The Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11,670, 1343 U.N.T.S. 89 (the "Hague Convention") governs civil proceedings filed in signatory countries for the recovery of abducted children. The United States and Mexico are signatories to the Convention. The International Child Abduction Remedies Act, 22 U.S.C. §§ 9001–9011 ("ICARA"), implements the Hague Convention in American law. The Hague Convention and ICARA empower courts to order the return of children removed from their country of habitual residence, not to determine the merits of an underlying custody dispute. 22 U.S.C. § 9001(b)(4); *England v. England*, 234 F.3d 268, 271 (5th Cir. 2000). Instead, a court's inquiry is limited to determining whether or not the child has been wrongfully removed from their country of "habitual residence." *Berezowsky v. Ojeda*, 765 F.3d 456, 465 (5th Cir. 2014) (citing 42 U.S.C. § 11601(b)(4); *Ruiz v. Tenorio*, 392 F.3d 1247, 1250 (11th Cir. 2004)). If the removal and subsequent retention were wrongful, the Hague Convention requires that a court order the return of the retained child.

The retention of a child is wrongful if the petitioner proves by a preponderance of the evidence that: (1) the child was retained somewhere other than the child's habitual residence; (2) the retention was in breach of the petitioner's rights of custody under the laws of the country of habitual

4

residence; and (3) the petitioner was exercising those rights at the time of retention. Hague Convention arts. 3, 12. Recently, the Supreme Court clarified that "the determination of habitual residence does not turn on the existence of an actual agreement" between the parents. *Monasky v. Taglieri*, 140 S. Ct. 719, 726 (2020). The Court held that the "bottom line" is that "[t]here are no categorical requirements for establishing a child's habitual residence—least of all an actual-agreement requirement for infants" *Id.* at 728. This approach complements existing Fifth Circuit precedent, which "balances the interests of the child, who is the ultimate focus of the Convention, and the intentions of [the child's] parents, who usually effect the removal or retention giving rise to a Convention petition." *Larbie v. Larbie*, 690 F.3d 295, 310 (5th Cir. 2012). This analysis "begins with the parents' shared intent or settled purpose regarding their child's residence" and gives greater weight to the parents' intentions when the child is young. *Id.* In cases involving young children, like this one, the threshold question is "whether both parents intended for the child to abandon the [habitual residence] left behind." *Id.* at 310–11.

The Hague Convention also provides that if the child's removal or retention is deemed wrongful and "the date of the commencement of the proceedings" before the court where the child is located is "less than one year" from the date of the removal or retention, the court "shall order the return of the child forthwith." Hague Convention art. 12. Even if it has been longer than one year, the court "shall also order the return of the child[ ], unless it is demonstrated that the child is now settled in its new environment." *Id.* "ICARA requires the abducting parent to establish by a preponderance of the evidence that Article 12's exception to return applies." *Lozano v. Montoya Alvarez*, 572 U.S. 1, 6 (2014) (citing 42 U.S.C. § 11603(e)(2)(B)).

Respondents in Hague Convention cases may assert "several narrow affirmative defenses to wrongful retention." *Larbie*, 690 F.3d at 308. Specifically, they may argue that (1) return of the child would pose a grave risk of physical or psychological harm, (2) return would violate the returning

5

country's fundamental principles relating to the protection of human rights and fundamental freedoms, (3) judicial proceedings were commenced at least one year after the date of retention and the child is now settled into the new environment, (4) the child has reached a sufficient age and level of maturity and objects to return, and/or (5) the petitioner seeking return of the child had consented to or subsequently acquiesced to the removal or retention. *Gallardo v. Orozco*, 954 F. Supp. 2d 555, 575 (W.D. Tex. 2013).

Both the "grave risk" and "fundamental principles" defenses must be proven by clear and convincing evidence. *Id.* (citing 42 U.S.C. § 11603(e)(2)(A)); *see also Waste Mgmt. of Washington, Inc. v. Kattler*, 776 F.3d 336, 341 (5th Cir. 2015) (quoting *Hornbeck Offshore Servs., L.L.C. v. Salazar,* 713 F.3d 787, 792 (5th Cir. 2013)) ("Evidence is clear and convincing if it 'produces in the mind of the trier of fact a firm belief . . . so clear, direct and weighty and convincing as to enable the fact finder to come to a clear conviction, without hesitancy, of the truth of precise facts of the case.'"). For "grave risk," "[t]he alleged harm 'must be a great deal more than minimal' and 'greater than would normally be expected on taking a child away from one parent and passing him to another.'" *Madrigal v. Tellez,* 848 F.3d 669, 676 (5th Cir. 2017) (quoting *Walsh v. Walsh*, 221 F.3d 204, 218 (1st Cir. 2000)); *see also Soto v. Contreras*, 880 F.3d 706, 710–11 (5th Cir. 2018) ("The principles underlying the Hague Convention require the 'grave risk [to] be narrowly construed; otherwise, a broad interpretation would cause the exception to swallow the rule and transform the Convention into an arena for custody disputes.'").

A less-settled area of law in this context concerns whether allegations of spousal abuse, in or out of the child's presence, can support a grave risk finding. *See Simcox v. Simcox*, 511 F.3d 594, 605 (6th Cir. 2007) ("[W]hile all jurists would agree that *some* level of domestic abuse will trigger the Article 13b exception, the more difficult question is at precisely what level will return expose the child to a '*grave* risk' of harm or place the child in an '*intolerable* situation'?"). The Fifth Circuit has stated that "sustained spousal abuse can, in some instances, create [a grave] risk." *Soto*, 880 F.3d at

6

712–13 (citing *Madrigal*, 848 F.3d at 669; *Walsh*, 221 F.3d at 204); *accord Gomez v. Fuenmayor*, 812 F.3d 1005, 1010 (11th Cir. 2016) ("While the proper inquiry focuses on the risk faced by the child, not the parent, we hold that sufficiently serious threats and violence directed against a parent can nonetheless pose a grave risk of harm to a child as well."); *Ermini v. Vittori*, 758 F.3d 153, 164 (2d Cir. 2014) (similar). And it has approvingly noted out-of-circuit cases finding grave risk that "involve substantial violence" and/or "concrete" threats of violence, often in the child's presence. *Madrigal*, 848 F.3d at 677.

At the same time, the Fifth Circuit has rejected "a bright-line rule that allegations of spousal abuse create grave risk to a child," reasoning that such a principle would "circumvent the Hague Convention's principle that 'the best interests of the child are well served when decisions regarding custody rights are made in the country of habitual residence.'" *Soto*, 880 F.3d at 712–13 (quoting *Abbott v. Abbott*, 560 U.S. 1, 20 (2010)); *see also Walsh*, 221 F.3d at 218 (quoting *Nunez–Escudero v. Tice–Menley*, 58 F.3d 374, 377 (8th Cir. 1995)) (because ICARA does not permit courts "to engage in a custody determination," "it is not relevant who is the better parent in the long run, or whether the absconding parent had good reason to leave her home and terminate her marriage") (cleaned up). Other courts have recognized, though, that the Hague Convention's provisions do not neatly address allegations of partner violence, forced/coerced sex, or emotional abuse. *See, e.g.*, *Neumann v. Neumann*, 684 F. App'x 471, 490–91 (6th Cir. 2017) (Daughtrey, J., concurring in part and dissenting in part)[1]; *Khan v. Fatima*, 680 F.3d 781, 784 (7th Cir. 2012) (quoting Merle H. Weiner, *Navigating the Road between Uniformity and Progress: The Need for Purposive Analysis of the Hague Convention on the Civil Aspects of International Child Abduction*, 33 Colum. Hum. Rts. L. Rev. 275, 279 (2002)) ("While the remedy of return works well if the abductor is a non-custodial parent, it is inappropriate when the

---

[1] "There has been a movement to amend the Hague Convention to make fleeing from domestic violence for safety reasons a stand-alone defense to the return of an abducted child. There have also been efforts to revise the convention so that such flight is not a 'wrongful removal' in the first place."

7

abductor is a primary caretaker who is seeking to protect herself and the children from the other parent's violence."); *id.* (collecting academic sources).

The Tenth Circuit's approach in *Gil-Leyva v. Leslie*, 780 F. App'x 580 (10th Cir. 2019) is instructive. After reviewing evidence that the petitioner father physically abused the respondent mother, the court reasoned that "[t]hough this testimony is deeply concerning, and undeniably will figure in any [foreign] custody proceedings, spousal abuse is relevant for Article 13(b) purposes only if it 'seriously endangers' the child." *Id.* at 590. Like the Fifth Circuit in *Soto*, the Tenth Circuit differentiated between "[e]vidence of a 'clear and long history of spousal abuse,'" which could "suffice to show a propensity for child abuse" and evidence of "isolated incidents of abuse," which generally demonstrate a risk of harm only to the spouse." *Id.* (quoting *Walsh*, 221 F.3d at 220). The court held that "[a]t a minimum, the spouse must 'draw a connection' showing that the risk such abuse poses to her 'constitute[s] a grave risk to the children.'" *Id.* (quoting *Charalambous v. Charalambous*, 627 F.3d 462, 468 (1st Cir. 2010)); *see also Norinder v. Fuentes*, 657 F.3d 526, 535 (7th Cir. 2011) (quoting *Van De Sande v. Van De Sande*, 431 F.3d 567, 572 (7th Cir. 2005)) ("Concern with comity among nations argues for a narrow interpretation of the 'grave risk of harm' defense; but the safety of children is paramount.").

### III.  DISCUSSION

Esquivel argues that at the time Garcia removed Y.E.G., he "was exercising custody rights" and that "Y.E.G. was habitually resident in Mexico" within the meaning of the Hague Convention. (Compl., Dkt. 5, at 4). At the hearing, Garcia largely did not contest Esquivel's arguments that the four-part test determining whether Y.E.G.'s removal from Mexico was wrongful is satisfied in this case. Instead, Garcia asserted two of the affirmative defenses to Y.E.G.'s return: "grave risk" and "fundamental principles." The Court analyzes both the four-part test and the affirmative defenses below.

**A. Wrongful Removal**

Esquivel has proven each of the three elements required to establish that Y.E.G.'s removal and retention were wrongful.

First, Y.E.G. was removed to and retained in the United States, outside of Mexico, his habitual residence. Esquivel explicitly argues that he and Garcia "never possessed the shared parental intent to relocate Y.E.G. from his habitual place of residence in Mexico and move him to the United States." (Compl., Dkt. 5, at 6). He states that "[t]here was never any discussion between Esquivel and Garcia concerning relocating to the United States" and that "there was never any discussion between Esquivel and Garcia about relocating Y.E.G. to the United States." (*Id.*). Essentially, Esquivel asserts a total absence of shared intent to relocate Y.E.G. to the United States. At the hearing, Garcia did not contest that Y.E.G. had lived in Mexico since his birth or that Esquivel ever intended to move Y.E.G. out of Mexico. Given the absence of facts that would support a conclusion otherwise, as would be necessary in the "fact-driven inquiry" the Supreme Court has delineated, this is a "straightforward" case: "[w]here a child has lived in one place with her family indefinitely, that place is likely to be her habitual residence." *Monasky*, 140 S. Ct. at 727.

Second, Y.E.G.'s removal and retention breached Esquivel's rights of custody under Mexican law. Garcia challenges the validity of Esquivel's custody rights, noting that while he presented Y.E.G.'s birth certificate, "there was no evidence presented that Esquivel executed a voluntary acknowledgement or that there exists any court judgment declaring him the father under Mexican or Michoacán law." (Resp.'s Br., Dkt. 30, at 3). There was also no evidence of genetic testing presented. (*Id.*). Esquivel responds that his biological paternity of Y.E.G. is uncontroverted, and that "Garcia cites no legal authority and provides no plausible reasoning to show, despite the unmistakable showing in the birth certificate and her testimony on the record that Esquivel is the father, why a court judgment or paternity testing is required." (Pet.'s Br., Dkt. 33, at 8).

Mexican law distinguishes parental authority (*patria potestad*) from custody of a child. Stephen Zamora, et al., *Mexican Law* 473 (2004). The former concept refers to "[t]he whole group of powers—which also entail duties—conferred upon those who exercise them . . . for the protection of non-emancipated minors with regard to their person and property," while the latter concept indicates "the personal care of a minor child." *Id.* (quoting R. De Pina Vara, *Diccionario de Derecho* 400 (1992)). "Custody is generally understood as a temporary right." *Id.* The FCC[2] recognizes multiple methods of filiation for children born of unmarried parents, each of which attaches legitimate parental authority. *Id.* at 474–75. One of those is voluntary acknowledgment of paternity, which may be done at the time the information for a birth certificate is collected. *Id.* at 475–76, 476 n.67. Meanwhile, "[u]nless custody of the child has been lost to one of the parents by way of a judicial decision, both parents have the same rights with regard to access to the child, according to family law." Immigration and Refugee Board of Canada, *Responses to Information Requests (RIRs)* (May 20, 2003), https://www.justice.gov/sites/default/files/eoir/legacy/2013/11/07/MEX41510.E.pdf (summarizing information obtained from a Mexican consular representative).

While parental authority and custody are thus distinct concepts in Mexican law, people who possess parental authority over a child generally have custody rights as well unless altered by judicial decision. *See* Immigration and Refugee Board of Canada, *Child Custody Rights; The Right of a Parent to Know the Location of His or Her Children When the Spouse Relocates within Mexico; Child Abduction and Legal Recourse to Protection (Amparo) in Custody Situations; Changes to Child Custody Provisions as a Result of the General Law on Women's Access to a Life Free of Violence (Ley General de Acceso de Las Mujeres a Una Vida Libre de Violencia)* (Sept. 15, 2011), https://www.refworld.org/docid/507544b82.html (summarizing information obtained from a "coordinator with the Network for Children's Rights in Mexico"); *see*

---

[2] "[T]he state civil codes in Mexico are highly uniform, having for the most part adopted verbatim the provisions of the Civil Code for the Federal District of Mexico City [the "FCC"]." Zamora, et al., *supra*, at 459.

*also Soto Pena v. Serrano*, No. 1:17-CV-903-RP, 2017 WL 6542758, at *5 (W.D. Tex. Dec. 21, 2017); *Saldivar v. Rodela*, 879 F. Supp. 2d 610, 623–24 (W.D. Tex. 2012); Patricia Begne, *Parental Authority and Child Custody in Mexico*, 39 Fam. L.Q. 527 (2005). Esquivel provided the Court with a translation of an excerpt of the Family Code for the State of Michoacán, Mexico, which comports with these principles. (Dkt. 5-3 at 2–6).

In any case, Garcia does not challenge the application of any of these principles or specific provisions of Mexican or Michoacán law. Her argument against Y.E.G.'s return, as presented in full at the hearing and in her brief, does not contest that Y.E.G.'s removal from Mexico would breach Esquivel's custody rights. Given that Michoacán law provides for parental cohabitation, the Court therefore finds that Garcia's removal of Y.E.G. breached Esquivel's rights of parental authority and custody.

Third, the Court also finds that Esquivel was exercising his rights of parental authority and custody at the time of Y.E.G.'s removal and subsequent retention. Esquivel asserts as much, and Garcia does not challenge it.

At the hearing, Garcia implied that the Hague Convention's "one year" provision might apply. *See* Hague Convention art. 12. The Court disagrees. The Supreme Court has considered the one-year period to start running on the date of removal from the initial country. *See Lozano*, 572 U.S. at 5, 16. At the hearing, Garcia stated that she and Y.E.G. entered the United States on or about February 22, 2019. The proceedings in this case commenced on January 27, 2020, less than one year after the date of removal. (Notice of Electronic Filing, Dkt. 1). Therefore, this "exception to the return remedy" does not apply here. *Lozano*, 572 U.S. at 5.

### B. Affirmative Defenses

At the hearing, Garcia asserted two of the affirmative defenses to Y.E.G.'s return: "grave risk" and "fundamental principles." Each of these must be proven by clear and convincing evidence.

11

42 U.S.C. § 11603(e)(2)(A); *see generally see also Waste Mgmt. of Washington*, 776 F.3d at 341. The Court finds that she has not met this demanding standard for each defense.

### 1. Grave Harm

At the hearing, Garcia testified that Esquivel sexually assaulted her repeatedly over the course of a year. She testified directly that she asked him to stop many times. She stated that the assaults were infrequent at first, but then became more common. At some point, she began to sleep in a different room than Esquivel, taking Y.E.G. (who previously slept in a separate bedroom) with her. Her account is consistent with, though not explicitly corroborated by, an exhibit of translated text messages between Esquivel and Garcia that Esquivel introduced into evidence in which Garcia says to Esquivel that he knows what he has done.

Garcia also testified that Esquivel would exercise severely restrictive control over her daily activities, especially by limiting her freedom of movement. The neighborhood in which they lived was some distance from central Tuzantla, and Garcia testified that Esquivel would not let her leave it alone, whether to go to the store or visit her family. In Garcia's view, Esquivel wanted to keep her locked in his house and for her to follow his orders, comporting with what he saw as the custom in their community. Garcia said that after she and Y.E.G. left Tuzantla, Esquivel called her daily after somehow obtaining her new phone number, threatening to drag her back by her hair and saying that he would find her and Y.E.G. wherever they went. Garcia further explained that Esquivel's family shared his tendency for controlling behavior and threats. His mother, in particular, ordered Garcia to follow Esquivel's commands and threatened Garcia that if anything happened to Esquivel, she would destroy her and take Y.E.G. away.

Garcia testified that Esquivel would get angry with her for trying to discipline Y.E.G. and attempted to turn the child against her. In Garcia's estimation, Y.E.G. was "not a happy [child]." She believes that returning Y.E.G. to live with Esquivel would pose a medium risk to the child's

mental well-being and that it is certain that Esquivel and his family would further interfere with her and Y.E.G.'s relationship. She stated that Esquivel would give Y.E.G. beer to drink when his friends came over and that Esquivel prevented Y.E.G. from making friends with other children. But besides those incidents, she did not testify that Esquivel directly physically, sexually, or emotionally abused Y.E.G.

In his testimony, Esquivel denied each of Garcia's allegations. The question before the Court is therefore whether Garcia's allegations (even, *arguendo*, viewed in the light most favorable to her) amount to clear and convincing evidence of "sustained spousal abuse" supporting a finding of grave risk *to Y.E.G. Soto*, 880 F.3d at 712–13; *see also Gil-Leyva*, 780 F. App'x at 590.

Garcia argues that they do: because "there was testimony from both parties that the couple lived in a small house with their son and that Garcia was not allowed to go anywhere with her son unless Esquivel took them, so any threats or violence that occurred were likely to have occurred in . . . Y.E.G.'s presence," and "Y.E.G. was exposed to, at a minimum, sustained sexual abuse and serious threats." (Resp.'s Br., Dkt. 30, at 2). Garcia maintains that that the Court should consider the fact that Esquivel lives in a "remote rural area," with few resources available for addressing partner violence, and that Esquivel's mother and Esquivel can be considered to have made serious threats to Garcia. (*Id.* at 2–3 (citing *Nunez-Escudero v. Tice-Menley*, 58 F.3d 374, 378 (8th Cir. 1995) ("To ensure that the child is adequately protected, the Article 13b inquiry must encompass some evaluation of the people and circumstances awaiting that child in the country of his habitual residence."))). She further contends that the *Gil-Leyva* standard is applicable, and that she has met it, by clear and convincing evidence, "by demonstrating that past abuse took place in the presence of Y.E.G. and also by demonstrating that Esquivel is unwilling to take any steps to direct the behavior and growth of Y.E.G." (*Id.* at 3).

Esquivel, in response, argues that Garcia's testimony does not establish a "sustained pattern of physical abuse and/or a propensity for violent abuse" on his part. (Pet.'s Br., Dkt. 33, at 2 (quoting *Ermini*, 758 F.3d at 164)). He points to other witnesses she could have called to bolster her account of "the alleged sexual assaults," which he differentiates from "physical abuse," asserting that "[a] few vague and unconfirmed statements simply do not reach the threshold of demonstrating that this occurred by 'clear and convincing' evidence in the face of [Esquivel and Garcia's] testimonies." (*Id.* at 3). He also maintains that Esquivel's mother and Esquivel's alleged threats are only isolated statements, "nothing [as] serious as a death threat," supporting a finding of no grave risk. (*Id.* at 3–5 (citing *Monroy v. de Mendoza*, No. 3:19-CV-1656-B, 2019 WL 7630631, at *9–12 (N.D. Tex. Sept. 20, 2019), *report and recommendation adopted*, No. 3:19-CV-1656-B, 2019 WL 5204832 (N.D. Tex. Oct. 16, 2019); *Stewart v. Marrun*, No. 4:09CV141, 2009 WL 1530820, at *4 (E.D. Tex. May 29, 2009))). Esquivel also agrees that the *Gil-Leyva* standard should apply. (*Id.* at 6–7).

The Court acknowledges and does not take lightly Garcia's testimony, including her opinions that Esquivel will not change his behavior should Y.E.G. be returned and that the return would cause Y.E.G. some measure of psychological harm. "But [Garcia's] trepidation, even if justified, does not amount to clear and convincing evidence of a grave risk with no prior history of abuse towards the [child]." *Hart v. Anderson*, No. GJH-19-2601, 2019 WL 6253248, at *20 (D. Md. Nov. 22, 2019) (applying *Gil-Leyva*). The issue here is not whether the Court doubts the truth of Garcia's testimony or minimizes the import of the violence she has experienced. Indeed, if Garcia's testimony is taken as true, she has demonstrated "sustained spousal abuse." *Soto*, 880 F.3d at 712–13.

But even viewing the evidence in the record in the light most favorable to Garcia, the Court holds that under the clear and convincing evidence standard, she has not connected the risk it poses to her to the eminent possibility of a grave risk *to Y.E.G. See Gil-Leyva*, 780 F. App'x at 590; *Soto*, 880 F.3d at 712–13. In doing so, the Court adopts the *Gil-Leyva* standard in the absence of clear Fifth

14

Circuit precedent to the contrary, finding that it is consistent with the current state of Fifth Circuit law in this area. In particular, there are no allegations that Esquivel abused or was violent toward Y.E.G. directly. The spatial proximity to Y.E.G. of his alleged acts toward Garcia, in the small house, does not itself amount to a "grave risk." Moreover, under Fifth Circuit precedent, the alleged threats from Esquivel and his mother also do not meet this standard. *See Madrigal*, 848 F.3d at 676–77. Ultimately, these are matters best considered by a Mexican court.

### 2. Fundamental Principles

Garcia also argued at the hearing that returning Y.E.G. to Mexico would violate Article 20 of the Hague Convention, which allows a court to refuse to return a child if it "would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms." She did not present any evidence of Mexican law or official policy to this effect.

"This exception was intended to be narrowly applied and is not to be used 'as a vehicle for litigating custody on the merits or for passing judgment on the political system of the country from which the child was removed.'" *Castro v. Martinez*, 872 F. Supp. 2d 546, 557 (W.D. Tex. 2012) (quoting Hague International Child Abduction Convention; Text and Legal Analysis, 51 Fed. Reg. 10,494, 10,510 (Mar. 26, 1986)). It is not enough for Garcia "to show merely that [Y.E.G.'s] return would be incompatible, even manifestly incompatible, with these principles"; instead, she would need to show that "the fundamental principles of [Mexico] concerning the subject-matter of the Convention do not permit it." Elisa Pérez–Vera, Explanatory Report on the 1980 Hague Child Abduction Convention, in 3 Conference de La Haye de droit international privé, Actes et Documents de la Quatorziéme Session, Enlévement d'enfants 462 (1982), https://www.fjc.gov/sites/default/files/2016/Explanatory%20Report%20by%20Elisa%20Pe%CC%81rezVera%20Report_0.pdf (Pérez–Vera Report); *see generally* Hague International Child

Abduction Convention, 51 Fed. Reg. at 10,503 (noting that the "explanatory report is recognized by the Conference as the official history and commentary on the Convention"). Accordingly, the Court finds that she has not made the required showing to invoke this exception to return.

## IV.  CONCLUSION

For the reasons discussed above, **IT IS ORDERED** that the relief Esquivel requests in his Complaint, (Dkt. 5), is **GRANTED**. Y.E.G. is to be promptly and safely returned to Esquivel's custody in Mexico.

However, **IT IS FURTHER ORDERED** that the effective date of this Order is stayed, indefinitely, until such time as the Court and the parties can be reasonably confident that the COVID-19 pandemic no longer renders international travel unsafe and widespread social distancing practices are no longer necessary. (*See generally* Am. Emergency Order, Dkt. 34). The Court will schedule status conferences as necessary to determine the precise date and the logistics of Y.E.G.'s return, involving the Mexican Consulate when appropriate and keeping in mind the need to ensure Y.E.G.'s return is both "prompt" and "safe."[3] Hague Convention art. 7.

**IT IS FINALLY ORDERED** that within **30 days** after Y.E.G. has been returned to Esquivel, Esquivel may submit a motion for costs and fees, accompanied by a final list of his incurred expenses, including attorney's fees, court costs, and transportation costs related to the return of Y.E.G. *See* 42 U.S.C. § 11607(b)(3). Should Esquivel file such a motion, Garcia may respond within **14 days**.

**SIGNED** on April 30, 2020.

                                                  ROBERT PITMAN
                                                  UNITED STATES DISTRICT JUDGE

---

[3] Mexican Consulate staff attended the hearing and informed the Court that they would be willing and able to assist with this process if the Court were to order Y.E.G.'s return.

16